DMP/AAS:JAM
F. #2019R00989

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

       - against -

SHUJUN WANG,

          Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - X

22-MJ-250

TO BE FILED UNDER SEAL

COMPLAINT AND
AFFIDAVIT IN SUPPORT
OF ARRREST WARRANT

(18 U.S.C. §§ 951(a), 1001(a)(2),
1028(a)(7), 1028(b)(2)(B) and
1028(c)(3)(A))

EASTERN DISTRICT OF NEW YORK, SS:

          GARRETT IGO, being duly sworn, deposes and states that he is a Special

Agent with the Federal Bureau of Investigation ("FBI"), duly appointed according to law and

acting as such.

ACTING AS AN AGENT OF A FOREIGN GOVERNMENT
WITHOUT PRIOR NOTIFICATION TO THE ATTORNEY GENERAL

          In or about and between January 2016 and August 2021, both dates being

approximate and inclusive, within the Eastern District of New York and elsewhere, the

defendant SHUJUN WANG did knowingly act in the United States as an agent of a foreign

government, to wit: the People's Republic of China ("PRC"), without prior notification to the

Attorney General of the United States, as required by law.

          (Title 18, United States Code, Section 951(a))

CRIMINAL USE OF IDENTIFICATION

          In or about and between January 2016 and August 2021, both dates

approximate and inclusive, within the Eastern District of New York and elsewhere, the

defendant SHUJUN WANG, together with others, did knowingly and intentionally possess, without lawful authority and in and affecting interstate and foreign commerce, one or more means of identification of another person, to wit: telephone numbers and other contact information belonging to one or more pro-democracy activists and Chinese dissidents, individuals whose identities are known to the Affiant, with the intent to commit, and aid and abet, and in connection with, unlawful activity that constituted one or more violations of Federal law, to wit: acting as an agent of a foreign government without prior notification to the Attorney General, in violation of Title 18, United States Code, Section 951(a), committed in a manner set forth in this Criminal Complaint.

(Title 18, United States Code, Sections 1028(a)(7), 1028(b)(2)(B) and 1028(c)(3)(A))

<u>FALSE STATEMENTS</u>

On or about April 12, 2019, within the Eastern District of New York, the defendant SHUJUN WANG did knowingly and willfully make one or more materially false, fictitious and fraudulent statements and representations, in a matter within the jurisdiction of the executive branch of the Government of the United States, to wit: the making of false statements to federal law enforcement agents, to include: WANG's representations that he had never had contact with members of the PRC's Ministry of State Security ("MSS"), when

in fact WANG had extensive contacts with MSS and other PRC government officials,

including possessing MSS and PRC contacts in his address book.

(Title 18, United States Code, Section 1001(a)(2))

FACTUAL ALLEGATIONS

The source of your deponent's information and the grounds for his belief are

as follows:[1]

1.      I have been a Special Agent with the Federal Bureau of Investigation

("FBI") for approximately ten years.   I am familiar with the facts and circumstances set

forth below from my participation in the investigation, my review of the investigative file

and from reports of other law enforcement officers involved in the investigation.   Unless

specifically indicated, all conversations and statements described in this affidavit are related

in sum and substance and in part only and are based on draft translations from Mandarin to

English.   Because this affidavit is being submitted for the limited purpose of establishing

probable cause, I have not described all of the relevant facts and circumstances of which I am

aware.

I.      The Defendant and the Criminal Scheme

2.      The defendant SHUJUN WANG ("WANG") is a 73-year naturalized

American citizen of Chinese descent who resides in both Flushing, Queens and Norwich,

Connecticut.   While living in the PRC prior to 1994, WANG was a Professor at Qingdao

College of Social Sciences.   In or about 1994, WANG came to the United States as a

visiting scholar for a two-year term at a university in New York City, and in 1996 he was

---

[1]      Because the purpose of this complaint is to provide only probable cause to
arrest, I have not described all the relevant facts and circumstances of which I am aware.

granted an EB-1 permanent worker visa for outstanding professors.   He was later granted lawful permanent resident status and became a naturalized American citizen in 2003.

3.       In or about 2006, WANG was a founder of the Hu Yaobang and Zhao Ziyang Memorial Foundation (the "Memorial Foundation"), an organization located in Flushing, Queens dedicated to honoring Hu Yaobang and Zhao Ziyang, former leaders of the Chinese Communist Party ("CCP") who promoted political and economic reforms within the PRC and were eventually forced from power.   Many of the Memorial Foundation's directors are well-known pro-democracy dissidents who oppose the current PRC government. WANG recently served as the Secretary General of the Memorial Foundation and has participated in the PRC dissident and pro-democracy communities in the Eastern District of New York and elsewhere.

4.       Although WANG is a member of the pro-democracy Memorial Foundation, the investigation has revealed that he has been acting as an agent of the PRC government, using his position with the Memorial Foundation and within the Chinese diaspora community in the New York metropolitan area to collect information about U.S.-based dissidents and to pass that information to the PRC government.   As described below, at least one democracy activist whom WANG provided information about was subsequently arrested by PRC authorities.

II.     Overview of the Chinese Intelligence Services' Structure and Activities

5.       Based on my training and experience in this and other investigations, I know that the government of the PRC conducts intelligence activities using a variety of sources, including through the MSS.   The MSS handles civilian intelligence collection for the PRC and is responsible for counterintelligence and foreign intelligence, as well as

political security.   The MSS consists of a central ministry, provincial state security departments and municipal state security bureaus.

6.     Among other things, the MSS and its regional bureaus focus on identifying and influencing the foreign policy of other countries, including the United States. The MSS and its bureaus seek to obtain information on political, economic and security policies that might affect the PRC, along with military, scientific and technical information of value to the PRC.

7.     One of the ways the MSS collects information is through clandestine and overt human source operations, of which the United States is a principal target.   To achieve their goals abroad, the MSS seeks to recruit, among others, current and former PRC nationals living outside the PRC, including in the United States, to serve as assets.   Assets are people who agree to help a foreign intelligence service by providing information to that service in response to taskings by foreign intelligence officers or agents.   The MSS then uses those assets to gather information that the government of the PRC can utilize for economic, political and military decision making and advantage.

8.     As relevant to this complaint, the MSS uses assets to collect information about, among other things, individuals and groups viewed as potentially adverse to the interests of the PRC, including ethnic Uyghur supporters of the East Turkestan independence movement; Tibetan supporters of the Tibetan independence movement; adherents of the Falun Gong; members of the Chinese democracy movement; and advocates for the Taiwan independence movement, which PRC officials have referred to as "the five poisons" threatening the stability of the PRC and Communist Party rule.

III.     Regulations for Agents of Foreign Governments

9.     An individual who acts in the United States as an agent of a foreign government is required to provide prior notification to the Attorney General, under the rules and regulations established by the Attorney General.   See 18 U.S.C. § 951(b); 28 C.F.R. §§ 73.1 et seq.

10.     The term "agent of a foreign government" includes an individual who agrees to operate within the United States subject to the direction and control of a foreign government or official, such as an asset of the MSS.   See 18 U.S.C. § 951(d).

IV.     WANG's Relationship with the MSS

11.     As described below, emails, chat communications, WANG's own admissions and other evidence show that, beginning at least in or about 2005, while acting under the direction and control of PRC and MSS officials, WANG reported to the MSS information about Chinese dissidents and members of the Chinese democracy movement in the United States and elsewhere.

12.     During that time, WANG operated under the direction and control of four MSS handlers ("MSS Officer #1," "MSS Officer #2," "MSS Officer #3" and "MSS Officer #4"), two each from two of the PRC's state security bureaus, the Qingdao State Security Bureau ("QSSB") and Guangdong State Security Bureau ("GSSB").   As described below, WANG's physical address book included an entry for MSS Officer #1 with the notation "Qingdao Section Chief."   MSS Officer #2, who was listed as a "Division Chief" in WANG's address book, was also affiliated with the QSSB and was referred to as "Boss" in communications between WANG and MSS Officer #1.   Based on the communications and their context, "Division Chief" was a higher ranking official than "Section Chief" in state

6

security bureau hierarchy.   MSS Officer #3 and MSS Officer #4 were associated with the

GSSB.   MSS Officer #3 communicated directly with WANG and reports to MSS Officer #4,

who was referred to as "Boss" in their communications.   WANG's address book also

contained an entry for "Guangzhou, Director," which was a reference to MSS Officer #4.

13.    As described below, WANG communicated with and provided

information to these MSS officers in a number of ways.   First, WANG conducted face-to-

face meetings with MSS officials while on trips to the PRC.   Second, WANG used a

messaging application to receive taskings from his MSS handlers and to send and receive

written messages and files.   Third, WANG memorialized the information he collected in

email "diaries" to be accessed by the individuals directing WANG's activities.   These

"diaries" included details about WANG's private conversations with prominent dissidents as

well as the activities of pro-democracy activists and human rights organizations.

14.    In conducting these activities, WANG did not notify the Attorney

General that he was acting as an agent of the PRC government.

V.    WANG's Tasking by the MSS

15.    Messages between WANG and MSS Officer #1 reflect WANG's status

as an MSS asset in the United States.   In these messages, MSS Officer #1 tasked WANG

with obtaining information on the activities of prominent Chinese dissidents and pro-

democracy activists, both in the United States and in the PRC.   The following messages

exchanged between WANG and MSS Officer #1 are illustrative of this conduct:

- In a series of messages on or about and between November 15, 2016 and
  November 17, 2016, WANG informed MSS Officer #1 about a book that was
  being written about Xi Jinping, the President of the PRC and the General
  Secretary of the CCP.   MSS Officer #1 thanked WANG for his efforts but stated
  that WANG's information was "too general" and directed him to follow up with

details about the author's book and its content, its estimated completion and publication date, and the individuals and organizations that were assisting the author with funding.   WANG responded, "OK! I understand!"

- In a series of messages on or about and between November 21, 2016 and November 22, 2016, WANG provided MSS Officer #1 with the date, time, location and list of attendees for an upcoming Memorial Foundation meeting. MSS Officer #1 responded that the meeting was extremely important to MSS Officer #1 and directed WANG to interface with a particular attendee to "accomplish the task" assigned by the "Boss," referring to MSS Officer #2.   MSS Officer #1 noted that the particular attendee had contacts with "Tibetans, Uyghurs and Mongolians" and wished WANG good luck at getting "good results" so that they could get more support from "Boss," that is, MSS Officer #2.   After WANG acknowledged MSS Officer #1's instructions, WANG later reported that the attendee arrived in Flushing, Queens from the PRC, confirmed his presence at the Memorial Foundation meeting and agreed to meet with WANG in person to discuss matters and the attendee's plan to make an "all-out effort" in 2017.   MSS Officer #1 responded and instructed WANG to find out details about the "all out effort," and WANG agreed.

- In a message on or about November 28, 2016, WANG forwarded to MSS Officer #1 an invitation addressed to "friends" in both the Tibetan and Han Chinese communities in the United States, inviting them to attend a banquet welcoming the Dalai Lama's newly appointed representative to the Chinese community in North America.   WANG informed MSS Officer #1 that various pro-democracy groups were hosting an event in the representative's honor and provided MSS Officer #1 with the date, time and location of the event, along with the names and phone numbers of the main organizers.   In a series of messages on or about November 29, 2016, WANG provided MSS Officer #1 with updated information about the event and its attendees, noting that there would be more than 40 attendees on the "Tibetan side" and around 60 to 70 individuals on the pro-democracy side.   MSS Officer #1 responded that WANG would be more valuable to the MSS if he could get ahold of the plans and "inside discussions" relating to cooperation amongst pro-democracy groups.

- In a message on or about December 2, 2016, WANG informed MSS Officer #1 that a prominent Chinese dissident from Hong Kong was scheduled to arrive in Washington, D.C. on December 5th to attend Congressional hearings regarding the "Hong Kong Causeway Bay [Books] Disappearances Incident,"[2] and later meet with WANG in New York.

---

[2] The "Causeway Bay Books Disappearances" refers to the disappearance, between October and December 2015, of five staff members of Causeway Bay Books, a former

VI.   WANG's Reporting to the MSS Using "Diaries"

16.   While operating under the direction and control of MSS officials, WANG communicated the information he gathered through "diary" entries, which he sometimes referred to as "William's diary."   While WANG sometimes sent messages containing "diary" entries to his MSS handlers and other PRC officials via email, he also saved them in draft email form to allow others to access the account and read the "diary" entry without the message being sent.   Internet protocol information for WANG's email account showed that his account was accessed on numerous occasions from IP addresses outside the United States at times when travel records reflected that WANG was in the United States.   Based on my training, experience and the information obtained through this investigation, I assess that MSS officers or persons working with them accessed WANG's email account to retrieve the substance of the "diary" entries.   The following are examples of "diary" entries detailing WANG's interactions with and assessments of well-known members of the pro-democracy movement in the United States and elsewhere:

- In a January 4, 2016 diary entry, WANG described a meeting with a prominent U.S.-based pro-democracy activist at a Democracy Party of China event, noting there were only "five people in the office."   WANG detailed their discussion about Taiwan-related events, the movement to end one-party CCP rule in the PRC, and fundraising efforts.

- In a March 15, 2016 diary entry, WANG shared his "analysis" of possible protests and disruptions during Xi Jinping's upcoming visit to the United States. WANG provided the name of the individual planning these demonstrations and shared another individual's assessment that the planners might not be as "aggressive as last year."

---

bookstore located in Causeway Bay, Hong Kong.   Guangdong security officials confirmed months later that the five staff members had been extrajudicially detained in mainland PRC.

- In another March 2016 diary entry, WANG provided an assessment of the pro-democracy movement within the Chinese community in Flushing, Queens. WANG noted that the number of activities had reduced "drastically" in recent years and provided a weekly schedule of two pro-democracy groups' activities.

- In a March 2019 diary entry, WANG listed possible speakers and attendees at a Tiananmen Square massacre memorial protest in New York.   According to WANG, one speaker identified by name was to deliver an "hour long" speech and describe his feelings "without any reservations."   WANG further stated that he had not heard from a well-known Taiwan democracy organization; that nothing dramatic occurred at a 50th birthday party in Flushing, New York, which 80 people attended; that a known anti-CCP protestor would likely attempt to block Xi Jinping's car when Xi visited President Trump at Mar-a-Lago in Florida; and that people in New York were not enthusiastic about "the democratic movement" because the Tiananmen Square protesters were too old now.

VII.   WANG's Reporting on a Hong Kong Activist Arrested by the PRC

17.     At least one Hong Kong democracy activist and dissident ("Hong Kong Dissident #1") about whom WANG reported to the MSS was subsequently arrested by the MSS or other PRC authorities, likely reflecting the MSS's interest in the individuals about whom they tasked WANG to gather information.   Moreover, in April 2019, WANG was found in possession of the names and contact information for other Hong Kong democracy activists who were subsequently arrested by the PRC on suspicion of organizing, publicizing, or taking part in several unauthorized gatherings during the 2019 and 2020 anti-extradition bill protests in Hong Kong, suggesting that WANG had provided information to the MSS about these other democracy activists as well.

18.     Hong Kong Dissident #1 is a well-known solicitor and politician in Hong Kong.   Hong Kong Dissident #1 is the former chairman of the Hong Kong Alliance in Support of Patriotic Democratic Movements of China, the former chairman of the Democratic Party and a former member of the Legislative Council of Hong Kong.

10

19.     Messages between WANG and MSS Officer #3 reflect WANG's tasking and reporting on Hong Kong Dissident #1.   In one exchange on or about November 16, 2016, WANG informed MSS Officer #3 that he "just finished chatting" with Hong Kong Dissident #1 in a telephone conversation, noting that he asked Hong Kong Dissident #1 "necessary questions" and received "candid" answers.   MSS Officer #3 responded "great" and with a thumbs-up emoji, instructing WANG to write it in a "diary."   WANG added that he had arranged to meet Hong Kong Dissident #1 in person at a restaurant after the Chinese New Year.

20.     As directed by MSS Officer #3, on or about November 16, 2016, WANG drafted a "diary" entry containing a recitation of his telephone conversation with Hong Kong Dissident #1.   WANG detailed Hong Kong Dissident #1's statements, including, inter alia, statements about the activities of various pro-democracy organizations; their discussion about Hong Kong independence and various candidates in upcoming elections in Hong Kong; and Hong Kong Dissident #1's opinions and outlook on various socio-political topics.   Some of WANG's notations in this "diary" entry are described below:

- WANG listed Hong Kong Dissident #1's home phone number and noted that he had to call him twice on or about November 16, 2016, as the first time he was told by a family member that Hong Kong Dissident #1 was not there.

- Hong Kong Dissident #1 told WANG that, while he was no longer serving on the Legislative Counsel, his human rights law practice was very busy and he was active with the Hong Kong Alliance in Support of Patriotic Democratic Movements of China.

- WANG asked Hong Kong Dissident #1 about the two newly elected council members losing their seats due to "antics" at the swearing in ceremony.   Hong Kong Dissident #1 responded that, while their actions were "out of line"; he did

not expect such harsh consequences.   Hong Kong Dissident #1 opined that he would not have done that himself and, while he did not support Hong Kong independence, he thought the Basic Law and the One Country Two Systems[3] model should be followed.

- WANG asked whether Hong Kong Dissident #1 believed the Chief Executive would be reelected.   Hong Kong Dissident #1 responded that it was difficult to predict, since the ultimate decision was with "Beijing" and President Xi Jinping, notwithstanding the Chief Executive's unpopularity.

- WANG asked about the Pan-Democratic Alliance and their candidates running for office.   Hong Kong Dissident #1 speculated about the number of votes needed but conceded that "Beijing" would ultimately be the deciding factor.

- Hong Kong Dissident #1 asked WANG when he planned to visit Hong Kong again.   WANG offered to meet at his daughter's restaurant after the Chinese New Year.   WANG offered to "treat" Hong Kong Dissident #1 and his family, and offered to host Hong Kong Dissident #1 when he visited New York.

21.    As discussed in the above "diary" entry to MSS Officer #3, WANG's phone records reflect two calls to Hong Kong Dissident #1 on or about November 16, 2016.

22.    In subsequent statements in July and August 2021, discussed in more detail below, WANG admitted to law enforcement officers that he knew Hong Kong Dissident #1, that MSS Officer #4 wanted WANG to treat Hong Kong Dissident #1 to a meal and get Hong Kong Dissident #1's thoughts and opinions on the Hong Kong elections, that WANG met with Hong Kong Dissident #1 at the direction of the MSS, and that WANG wrote up the substance of his conversations with Hong Kong Dissident #1 and provided the information to the MSS.

---

[3] The "Basic Law" and "One Country, Two Systems" are constitutional principles that describe the governance of Hong Kong as a special administrative region of China. Generally, they provide that there would be only one China, but that Hong Kong could retain its own economic and administrative systems, while the rest of Mainland China used a communist system run by CCP.

23.     WANG's reporting to the MSS about Hong Kong Dissident #1 likely represented only a portion of a multifaceted effort by the PRC government to track Hong Kong Dissident #1.   Eventually, the PRC government succeeded in its effort to stymie the dissident's pro-democracy activities.   On April 18, 2020, Hong Kong Dissident #1 was arrested for organizing a banned protest on October 1, 2019, China's National Day.   On May 28, 2021, Hong Kong Dissident #1 received two concurrent jail sentences of 18 months in prison for "inciting people to participate in an unlawful assembly" and for "organizing an unlawful assembly" in connection with the October 1, 2019 events.

VIII.   WANG Lied About His Foreign Agent Activities to U.S. Law Enforcement Officers

24.     On or about August 2, 2017, WANG voluntarily accepted an interview request from law enforcement and met with FBI agents, including an interpreter, at a restaurant in Flushing, Queens, within the Eastern District of New York.   During the interview, WANG denied having any contact with individuals from the MSS or other PRC state security services.   WANG claimed that he actively avoided contact with any PRC government officials, except for when he needed to procure a visa to travel to the PRC. WANG also claimed that he was able to travel freely to the PRC because, while the Memorial Foundation was pro-democracy, it did not espouse views openly opposed to the CCP.

25.     On or about April 12, 2019, WANG was referred for a secondary inspection by U.S. Customs and Border Protection ("CBP") upon his arrival at John F. Kennedy International Airport, within the Eastern District of New York, on a flight from the PRC.   WANG made materially false statements during this interview.   WANG stated that

13

he had "never" been approached by the MSS and had no contact with MSS or PRC officials, and stated that he had no PRC government contacts in his phone.   WANG was then given warnings regarding false statements pursuant to Title 18, United States Code, Section 1001 and told that if he had had any contact with PRC officials or was in possession of any Chinese government contacts in his phone, luggage or on his person, he could be charged with a crime.   WANG again denied that he presently had any PRC contacts on his person, in his luggage or on his phone and said, "[D]o anything, I don't care," with respect to CBP officials searching his phone and belongings.   WANG's denials were false because WANG had had repeated contact with MSS and PRC officials and was in possession of MSS and PRC contacts in his address book at the time of the interview.

26.     In a subsequent border search of WANG's luggage, CBP officers located a hand-written document with the names and telephonic contact information of approximately 64 pro-democracy activists, many of whom were located in the United States, as well as information for Hong Kong Dissident #1.

27.     CBP officers also found in WANG's possession a handwritten note, translated as follows:

> Go to the big temple on the sea shore in the morning, go to Weihai Road after breakfast, buy Chinese traditional clothes, the Cultural Street, shopping, meeting [MSS Officer #4] in the afternoon at 2:00, visit the Zhongshan Park, the Lu Xun Park, authentication.

Open-source information reveals that "Weihai Road," "Zhongshan Park" and "Lu Xun Park" are located in Qingdao, China.   The description in the note corresponds to the entry for "Guangzhou, Director" found in WANG's black address book, described below, which relates to MSS Officer #4.   As such, this notation – which appears to employ intentionally

14

vague, opaque language – may refer to a surreptitious meeting between WANG and MSS Officer #4.

28.     CBP officers also found in WANG's possession a physical, black address book, which contained numerous handwritten entries, in both English and Chinese, containing contact information for known PRC government officials, including the entries for MSS Officers #1-4 set forth in paragraph 12 above.

29.     Notably, none of the aforementioned PRC government contacts in WANG's black address book were saved as a contact in WANG's cell phone.   I therefore assess that, rather than using voice calls and text messages, WANG likely communicated with these individuals using other platforms, including email and encrypted messaging apps, which is a common practice used to evade law enforcement surveillance and detection.

IX.     WANG's Statements to an Undercover Law Enforcement Agent Admitting His Activities on Behalf of the MSS

30.     On or about July 31, 2021, an undercover agent ("the UC") met with WANG.   The UC was equipped with a recording device.   I have reviewed a summary translation of the recorded meeting between the UC and WANG.

31.     Initially, the UC knocked on the door of WANG's residence in Norwich, Connecticut, stated that he was from the PRC and was sent by "Boss" to deliver a message to WANG.   WANG asked the UC, "which Boss?"   The UC named MSS Officer #4.   WANG then invited the UC into his home.

32.     WANG questioned if the UC knew MSS Officer #4 personally.   The UC explained that he was sent by "the headquarters," but that he met with MSS Officer #4 once in person.   The UC stated that he also knew MSS Officer #1 quite well.   WANG

15

confirmed he knew both MSS Officers #1 and #4 and that he knew they worked for the MSS but claimed that he no longer had frequent contact with them since the pandemic began.

33.     The UC told WANG that MSS Officer #4 asked the UC to pass a message to WANG.   The UC explained that the MSS had received information that WANG was under investigation by the FBI and that WANG's electronic communications may have been monitored.   WANG asked the UC for assistance, and the UC said that he could help WANG get rid of "diaries" and other incriminating messages in certain email accounts.

34.     WANG described to the UC how, beginning in 2005, he would write "diaries" as a way to "communicate with friends," which the UC understood to refer to the MSS officers.   WANG stated that he typically wrote two or three "diary" entries per month. WANG stated that much of the information he conveyed about Chinese pro-democracy movements and activists was public, such as meeting minutes.

35.     WANG asked the UC to help him "delete" the "diaries."   The UC responded that it was not feasible to delete all of them since that would appear suspicious. WANG told the UC that he used certain email accounts to communicate with MSS Officers #3 and #4 and a different account to communicate with MSS Officers #1 and #2.   WANG provided the UC with passwords for his email accounts so that the UC could delete the "diaries" and other incriminating messages.   Specifically, WANG instructed the UC to log into the accounts, delete one "diary" entry, skip one, delete the next, and repeat this process.

36.     WANG also told the UC that his electronic devices could be retrieved by the UC from WANG's apartment in Flushing, Queens, indicating that the UC should corrupt any incriminating files on WANG's electronic devices.

37.     WANG and the UC also discussed Hong Kong Dissident #1.   WANG
stated that he was very close to Hong Kong Dissident #1 and recounted how MSS Officer #4
wanted WANG to treat Hong Kong Dissident #1 to a meal to ascertain Hong Kong Dissident
#1's thoughts and opinions on the Hong Kong elections.   WANG stated that he spent more
than $4,000 to have a meal with Hong Kong Dissident #1 and his family, and that he wrote
up the substance of their conversations but did not save it on his computer.

38.     WANG stated that if he is questioned by U.S. law enforcement, he
would offer the excuse that the information he provided was not classified.   However, as
discussed herein, WANG provided the MSS with nonpublic information regarding the
subjects of their surveillance, including U.S. persons.

X.     WANG's Admissions to Law Enforcement

39.     Approximately two weeks later, on August 11, 2021, law enforcement
approached WANG at his residence in Connecticut, identified themselves as FBI agents and
requested that WANG speak with them.   WANG agreed.   The interview was audio and
video recorded.

40.     WANG initially denied and misrepresented much of the interaction he
had with the UC.   For example, WANG initially claimed that the UC was a foreign
exchange student, then claimed the UC came to WANG's home to install an air conditioner.

41.     However, after further questioning, while denying that he worked for
the MSS as a foreign agent, WANG confirmed that he had a relationship with the MSS.   For
example, WANG stated the following:

- WANG confirmed that MSS Officer #1 is with the MSS in Qingdao and
  admitted that he provided MSS Officer #1 with information about various pro-

democracy events, venues and attendees.   WANG identified a picture of MSS Officer #1 in an MSS uniform.

- WANG admitted that MSS Officer #4 is with the MSS in Guangdong and that WANG has met with MSS Officer #4 in person on at least three occasions.

- WANG identified MSS Officer #3 as a subordinate of MSS Officer #4.

- WANG stated that MSS Officer #3 occasionally retrieved WANG from the airport when he traveled to the PRC.

- WANG admitted that the information he provided to the MSS was "not public" but that he did not consider it "secret," that is, classified.

- WANG admitted to knowing Hong Kong Dissident #1 and stated that he met with Hong Kong Dissident #1 at the request of the MSS, including taking Hong Kong Dissident #1 to dinner.   WANG admitted to providing the MSS with information about Hong Kong Dissident #1.

WHEREFORE, your deponent respectfully requests that the defendant

SHUJUN WANG be dealt with according to law.   I further request that this affidavit and the

arrest warrant be filed under seal as disclosure of this application would give WANG and

others an opportunity to destroy evidence, harm or threaten victims or other witnesses,

change patterns of behavior, notify confederates and flee from or evade prosecution.

GARRETT IGO
Special Agent
Federal Bureau of Investigation

Sworn to before me this
8th day of March, 2022   by telephone

THE HONORABLE MARCIA M. HENRY
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

18