

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

NJM:EHS/NCG
F. #2019R00989

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

April 4, 2025

By ECF

The Honorable Denny Chin
Sitting By Designation
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Shujun Wang
                Criminal Docket No. 22-230 (DC)

Dear Judge Chin:

      The government respectfully submits this letter in advance of the defendant's sentencing, which is scheduled for April 14, 2025. On August 6, 2024, following a 6-day trial, the defendant was convicted on all counts of an indictment charging him with conspiring to act as an agent of the government of the People's Republic of China ("PRC" or "China") without prior notification to the Attorney General, in violation of 18 U.S.C. § 371 (Count One), acting as an agent of the PRC government without prior notification to the Attorney General, in violation of 18 U.S.C. § 951 (Count Two), criminal misuse of identification, in violation of Title 18, United States Code, Section 1028(a)(7) (Count Three); and making false statements in connection with his interview with law enforcement on or about April 12, 2019, in violation of Title 18, United States Code, Section 1001 (Count Four).

      Wang was an asset of the PRC government's oppressive intelligence apparatus. As shown at trial, for over a decade the defendant masqueraded as a pro-democracy activist working against the Chinese government when in fact, he was insidiously reporting on the intimate details of the lives of democracy activists—his supposed friends and allies in the democratic movement—to the PRC government's Ministry of State Security ("MSS"). For the reasons below, the government respectfully submits that a sentence of 48 months' imprisonment would be sufficient, but not greater than necessary, to achieve the goals of sentencing in this case. Such a sentence would constitute just punishment, reflect the severity of the defendant's offense, promote respect for the law, and provide the specific and general deterrent effect called for by the defendant's offenses.

I.   Factual Background[1]

The defendant Shujun Wang is a naturalized United States citizen of Chinese descent and one of the founders of the Hu Yaobang and Zhao Ziyang Memorial Foundation (the "Memorial Foundation"), an organization located in Flushing, Queens, whose members are pro-democracy dissidents who oppose the current PRC government, including the Chinese Communist Party ("CCP"). (PSR ¶¶ 8-9). In 2006, Wang became Secretary-General of the Memorial Foundation. (*Id.* ¶ 9). But instead of promoting democracy in the PRC, Wang, under the direction of PRC government officials, used his position within the Memorial Foundation and his status within the Chinese diaspora community to collect information about prominent activists, academics, and dissidents, and reported that information to the PRC government. (*Id.* ¶ 10). Rather than working against the PRC, the defendant worked for the PRC to advance the interests of the CCP.

Since at least 2006—the same year that Wang became Secretary-General of the Memorial Foundation—Wang operated under the direction and control of his co-defendants—four officials who work or worked for the MSS, which is responsible for the PRC's foreign intelligence collection. (*Id.*). One of the ways the MSS collects information abroad is through human assets. (*Id.*). The MSS specifically targets individuals who are connected to groups and communities whom the PRC views as a threat to become assets. (*Id.*).

At the MSS's direction, Wang gathered information on people and groups that the PRC government considers subversive, such as pro-democracy advocates, advocates for Taiwanese independence, Uyghur and Tibetan activists, and Falun Gong religious practitioners. (*Id.* ¶ 12). Expert testimony at trial established that these groups form the "five poisons," which are groups that the PRC views as a threat and about which the MSS seeks to collect information, both in the United States and abroad. (*Id.*). Wang also provided to the MSS officers his analysis and insights into the pro-democracy movement in New York, including regarding the foundation of which he was a member. (*Id.*).

The defendant's fugitive co-defendants were all members of the MSS. (*Id.* ¶ 11). Defendant Feng He, also known as "Boss He," was a Director with the Guangdong State Security Bureau ("GSSB"), a division of the MSS located in Guangdong, PRC. (*Id.*). Defendant Ming Li, also known as "Elder Tang" and "Little Li," was also affiliated with the GSSB. (*Id.*). Defendant Jie Ji was a Section Chief of the Qingdao State Security Bureau ("QSSB"), a division of the MSS located in Qingdao, PRC. (*Id.*). Defendant Keqing Lu, also known as "Boss Lu" was also affiliated with the QSSB. (*Id.*).

---

[1]   The information below is taken from the United States Probation Department ("Probation") Presentence Investigation Report ("PSR") dated February 14, 2025 and related Addendum dated April 3, 2025; the documentary and testimonial evidence admitted at the defendant's trial ("GX" and "Trial Tr.", respectively); and other evidence gathered as part of the investigation and prosecution of the defendant.

2

A.  The Defendant's Reporting to the MSS

Wang communicated with and provided information to the MSS via a messaging application, email, and in-person meetings. (*Id.* ¶ 13). The defendant used an encrypted messaging application, WeChat, to receive directions from his co-defendants and to send and receive written messages and files; he wrote so-called email "diaries" to the MSS officers, which as described below, were intelligence reports disguised as diaries; and he conducted face-to-face meetings with MSS officials while on trips to the PRC. (*Id.*).

B.  Encrypted WeChat Communications

On or about November 14, 2016, co-defendant Li, an MSS officer, directed Wang to ask certain questions of a politician in Hong Kong who was active in Hong Kong's pro-democracy efforts, Albert Ho (also known as Ho Chun-Yan), who was referred to in the Indictment as Hong Kong Dissident #1. (*Id.* ¶ 14; GX 302T). Li specifically directed Wang to ask Ho about his "point of view about the Chief Executive election held next year" in Hong Kong. The defendant responded, "Okay!" (*Id.*). Telephone records show that two days later, the defendant called Ho twice. (*Id.* ¶ 14; GX 615). Immediately after the calls, Wang wrote to Li that he had "just finished chatting" with Ho in a telephone conversation, noting that he had asked "all the questions that should be asked" and received "straightforward" answers. (*Id.* ¶ 14; GX 302T). Li responded "great" and with a thumbs up emoji, instructing the defendant to write it in a diary. (*Id.*). The defendant responded that he would "write down the dialogue between the two of us, will be clear as crystal." (*Id.*). As directed by Li, on or about November 16, 2016, the defendant drafted a "diary" entry containing a recitation of his telephone conversation with Ho. (*Id.* ¶ 14; GX 202DT). Wang detailed Ho's statements and opinions, including regarding the activities of various pro-democracy organizations, Hong Kong independence, and various candidates in the election in Hong Kong as well as various socio-political topics. (*Id.*). Some of the defendant's notations in this diary entry include the following: Ho's home telephone number, Ho's statement that his human rights law practice was busy, Ho's statements about Hong Kong elections, and Ho's statements about his planned travel to Hong Kong. (*Id.*). Ho was later arrested in Hong Kong and remains detained there today, although the government did not allege at trial that Wang's reporting directly led to Ho's arrest. (PSR ¶ 14).

Later that same day, Li instructed the defendant to book a plane ticket to Hong Kong that would be paid for by co-defendant He, also known as "Boss He." (*Id.* ¶ 15; GX 302T). Li told the defendant that He wanted the defendant to come to Hong Kong soon after the Chinese Lunar New Year. (*Id.*). The defendant's travel records reflect that the defendant did, in fact, travel from New York to Hong Kong on or about February 2, 2017, less than a week after the Lunar New Year on January 28, 2017. (PSR ¶ 15).

In another series of encrypted communications between approximately November 15 and November 17, 2016, Wang informed co-defendant Ji, an MSS handler, about a book that was being written about Xi Jinping, the current President of the PRC and General Secretary of the CCP. (PSR ¶ 16). Ji thanked Wang for his efforts but stated that the information was "too general" and directed the defendant to obtain additional information about the book, including details about the book's content, its estimated completion and publication dated, and any individuals or

3

organizations assisting the author with funding. (*Id.*). Accepting his tasking, Wang responded enthusiastically, "Ok! I understand!" (*Id.*).

In another message exchange on or about November 22, 2016, Wang's MSS handler Ji instructed him to interface with a particular Chinese dissident attendee (the "Dissident") at an upcoming Memorial Foundation conference and to "accomplish the tasks" assigned by the "Boss," referring to co-defendant Lu, also known as "Boss Lu." (*Id.* ¶ 17; 301T). Ji also instructed the defendant that communications between the Dissident and the "Tibetans, Uyghurs and Mongolians" were "very important" and of "concern." (*Id.*). The MSS official wished Wang good luck at getting "good results." (*Id.*). After Wang acknowledged Ji's instructions, Wang reported that the Dissident had arrived in Flushing from the PRC, confirmed the Dissident's presence at the Memorial Foundation meeting, and arranged to meet with the Dissident in person. (*Id.*). Ji instructed Wang to find out details about the Dissident's plans. (*Id.*). Wang agreed. (*Id.*).

In a message on or about November 28, 2016, the defendant forwarded Ji an invitation addressed to "friends" in both the Tibetan and Han Chinese communities in the United States, inviting them to attend a banquet welcoming the Dalai Lama's newly appointed representative to the Chinese community in North America. (PSR ¶ 18; GX 301T). The defendant told Ji that various pro-democracy groups were hosting an event in the representative's honor and provided Ji with the date, time, and location of the event along with the names and phone numbers of the main organizers. (*Id.*). In a series of messages on or about November 29, 2016, Wang provided Ji with updated information about the event and its attendees, noting that there would be more than 40 attendees on the "Tibetan side" and around 60 to 70 individuals on the "pro-democracy side." (*Id.*). Ji responded that the defendant would be more valuable to the MSS if he could obtain the plans and "internal deep considerations" relating to cooperation amongst pro-democracy groups. (*Id.*). On or about November 28, 2016, Wang also forwarded Li the same invitation addressed to Tibetan friends. (*Id.*). On or about November 29, 2016, Wang sent Li a list of participants, ostensibly for the Tibet event. (*Id.*). As described above, those who support a free Tibet are one of the so-called five poisons, and the PRC government is against a free Tibet. (PSR ¶ 18).

C. "Diaries" to MSS Officers

As described above, Wang also memorialized information he gathered in email and Word document "diaries" to be sent to or accessed by the MSS. (*Id.* ¶ 19). Although the defendant disguised these emails as his "diary," they were in fact intelligence reports to the MSS. (*Id.*). They frequently included the private thoughts, intentions, and plans of some of the most influential Chinese democracy advocates in the world and others denounced by the CCP as "poison." (*Id.*). Wang passed along phone numbers and other contact information for these individuals to the MSS, including Ho, as noted above. (*Id.*). Wang sometimes sent messages containing "diary" entries to his co-defendants and others via email. He also saved them in draft email form to allow the MSS officers to access the account and read the "diary" entry without the message being sent, which was a form of operational security. (*Id.*). He called one diary "William's Diary" and called another "Wang's Diary." (*Id.*). As noted below, the defendant informed an undercover law enforcement agent that William's Diary was meant for co-defendant He and Wang's Diary was meant for co-defendant Ji. (*Id.*).

4

For example, in an August 10, 2011 "diary" entry, the defendant described visiting the office of the Epoch Times, a publication affiliated with the Falun Gong religious movement, one of the "five poisons." (GX 504T). In the diary entry, the defendant provided information regarding Falun Gong practitioners he met and the office they used. (*Id.*)

Additionally, in a January 4, 2016 "diary" entry, the defendant described meeting with a prominent U.S.-based pro-democracy activist at a Democracy Party of China event, noting that there were only five people in the office. (GX 202AT). The defendant detailed their discussion about Taiwan-related events, the movement to end one-party CCP rule in the PRC, and fundraising. (*Id.*).

In a March 15, 2016 "diary" entry, the defendant shared his "analysis" of possible protests and disruptions during President Xi's upcoming visit to the United States. (GX 202BT).

Finally, in a March 2019 "diary" entry, the defendant listed possible speakers and attendees at a Tiananmen Square massacre memorial protest in New York. (GX 203TR). The defendant wrote, among other things, that a known anti-CCP protester would likely attempt to block President Xi's car when he visited then-President Trump at Mar-a-Lago in Florida and that people in New York City were not enthusiastic about "the democratic movement" because the Tiananmen Square protesters were too old now. (*Id.*).

D. In-Person Meetings

As noted below, in a conversation with an undercover law enforcement agent and subsequent interviews with law enforcement, Wang admitted to meeting with the MSS officers in-person during his visits to China.

Specifically, the defendant stated that he met with He and Li at least three times and had known Ji for years. (Trial Tr. 576, 584, 590).

Wang never provided notice to the Attorney General that he was acting as an agent of the PRC government or a PRC official, as required by Title 18, United States Code, Section 951, and its implementing regulations. (GX S-1).

E. Wang's False Statements to Law Enforcement

In addition to this conduct, Wang made materially false statements to federal law enforcement, falsely denying that he had contacts with PRC officials or the MSS. (PSR ¶ 24). Specifically, on or about August 2, 2017, the defendant was voluntarily interviewed by the Federal Bureau of Investigation ("FBI"), with the assistance of an interpreter. (*Id.*) During the interview, the defendant falsely denied having contact with Chinese government officials. (Trial Tr. 553). The defendant further falsely claimed to have no contact with the MSS. (*Id.* at 554). Wang later admitted much of his conduct to an undercover law enforcement agent and during subsequent interviews with agents.

In April 2019, Wang was given a secondary inspection at John F. Kennedy International Airport after returning from the PRC and was found in possession of the names and contact information, including telephone numbers, for approximately 64 well-known dissidents,

5

including a witness who testified at trial and stated that she did not give the defendant permission to put her name and telephone number on this list. (PSR ¶ 25). After receiving warnings regarding false statements pursuant to Title 18, United States Code, Section 1001, the defendant again falsely denied that he had any contact with PRC government officials or the MSS. (Trial Tr. 328, 555). In fact, Wang had repeated contact with MSS and PRC officials and was in possession of MSS and PRC contacts in his address book at the time of the interview. (GX 100, 105, 105AT, 107, 107AT).

F. <u>Wang's Admissions to an Undercover Law Enforcement Agent</u>

On or about July 31, 2021, an undercover U.S. law enforcement agent (the "UC") met with the defendant at his home in Norwich, Connecticut. (PSR ¶ 26). The meeting was video recorded. The defendant invited the UC into his home. (*Id.*). The UC stated that he was from the PRC and was sent by "Chief He" to deliver a message to Wang. (*Id.*). Wang asked, "Which Chief He?" (*Id.*). The UC named defendant Feng He, also known as "Boss He." (*Id.*).

The defendant asked if the UC personally knew his co-defendant Boss He. (*Id.* ¶ 27). The UC explained that he was sent by "the headquarters," but that he had met with He once in person. (*Id.*). The UC stated that he also knew the defendant Jie Ji quite well. (*Id.*). Wang confirmed he knew both Ji and He as MSS officers, but claimed that he no longer had frequent contact with them since the COVID-19 pandemic began. (*Id.*).

During the meeting, the UC told Wang that defendant He asked the UC to pass a message to Wang and explained that the MSS had received information that Wang was under investigation by the FBI and that Wang's electronic communications may have been monitored. (*Id.* ¶ 28). The UC said that he could help Wang get rid of "diaries" and other incriminating messages in certain email accounts. (*Id.*). Wang described to the UC how, beginning in 2005, he wrote "diaries" to "communicate with friends"—referring to the MSS handling officers. (*Id.*). He said he wrote approximately two to three diary entries a month, largely about the pro-democracy movement. (*Id.*). He described how he wrote "Wang's Diary" for Ji and "William's Diary" for Boss He and Li. (*Id.*). He also admitted to communicating with MSS officers via WeChat. (*Id.*).

In response to the UC's offer, the defendant asked the UC to help him "delete" the "diaries." (*Id.* ¶ 29). The UC responded that it was not feasible to delete all of them since that would appear suspicious. (*Id.*). Wang told the UC that he used certain email accounts to communicate with defendants He and Li. (*Id.*). Wang provided the UC with passwords for his email accounts so that the UC could delete the "diaries" and other incriminating messages. (*Id.*). Specifically, Wang instructed the UC to log into the accounts and delete every other "diary" entry. (*Id.*; GX 800.10). Wang also told the UC that his electronic devices could be retrieved by the UC from Wang's apartment in Flushing, Queens, indicating that the UC should delete any incriminating files on Wang's electronic devices. (PSR ¶ 29). The UC stated that he could corrupt the files to render them inaccessible to U.S. officials, and that this was preferable to Wang attempting to delete files himself, which might arouse further suspicion. (*Id.*).

The defendant Wang and the UC also discussed Albert Ho (the now-imprisoned Hong Kong dissident). (*Id.* ¶ 30). Wang claimed that he was very close to Ho and recounted how Boss He directed Wang to treat Ho to a meal to ascertain his thoughts and opinions on the Hong

6

Kong elections. (*Id.*). Wang stated that he spent more than 4,000 (currency not stated) to have a meal with Ho and his family, and that Wang wrote up the substance of their conversations, but did not save it on his computer. (*Id.*). Wang stated that "they" only wanted to get a general idea of the movements and developments in the pro-democracy community to not be "blindsided." (*Id.*).

The defendant stated that, if questioned by U.S. law enforcement, he would offer the excuse that the information he provided to the MSS was also published in newspapers, and he explained that he simultaneously published information about the Memorial Foundation in newspapers as he also sent the same information to the MSS officers. (*Id.* ¶ 31; GX 800.10). He stated that publishing information about the Memorial Foundation was his idea. (*Id.*). In other words, the defendant crafted a plan for his defense at the time he provided information to the MSS. Of course, that the information is public is not a legal defense to acting at the direction of a foreign government without prior notification to the Attorney General. At any rate, much of what Wang sent the MSS was not in fact public information, but rather internal private discussions and personally identifying information of pro-democracy dissidents. (*See, e.g.*, GX 202DT).

G. <u>Wang's Admissions to Law Enforcement</u>

On or about August 11, 2021, U.S. law enforcement agents approached the defendant at his residence in Connecticut, identified themselves as FBI agents and requested that Wang speak with them. (PSR ¶ 32; Trial Tr. 564). Wang agreed. (*Id.*). The interview was video- and audio-recorded, and an interpreter was present. (PSR ¶ 32; Trial Tr. 565).

Initially, the defendant denied and misrepresented much of the interaction he had with the UC. (PSR ¶ 33). Wang initially claimed that the UC was a foreign exchange student, and then later claimed that the UC came to Wang's home to install an air conditioner. (*Id.*). After further questioning, while denying that he worked for the MSS as a foreign agent, Wang confirmed his relationship with the MSS. (*Id.*). Wang admitted that (a) defendant Ji worked with the MSS in Qingdao and that Wang provided Ji with information about various pro-democracy events, venues, and attendees, while also identifying a photograph of Ji in an MSS uniform; (b) the defendant He worked with the MSS in Guangdong, and that Wang met with He in person on at least three occasions; (c) the defendant Li, also known as "Elder Tang" and "Little Li," was a subordinate of He and that Li occasionally retrieved Wang from the airport when he traveled to the PRC; and (d) Wang provided the MSS with information about Ho, admitting that the information he provided to the MSS was "not public" but that he did not consider it "secret," that is, classified. (*Id.*).

On or about March 16, 2022, the defendant was arrested. (*Id.* ¶ 34). Following his arrest, the defendant was transported to offices of the FBI for processing, where he was read his *Miranda* rights and made a post-arrest statement. (*Id.*). The interview was video- and audio-recorded, and an interpreter was present. (*Id.*).

During the post arrest interview, the defendant admitted, among other things, that: (1) Ji is an MSS officer, and the defendant identified a photograph of Ji in his MSS uniform; (2) he sent information to the MSS, including about a prominent dissident who was later arrested, Ho; (3) he had WeChat communications with Ji; (4) he saved draft emails for MSS officers He and Li to read and shared email accounts with them, including one he created in China with Li; and (5) it

7

was not safe for him to travel to China with dissident contact information as he had done. (*Id.* ¶ 35).

H.  The Search of Wang's Residences

On or about March 16, 2022, law enforcement agents executed court-authorized warrants to search Wang's residences in Flushing and in Norwich, Connecticut. (*Id.* ¶ 36). Pursuant to those searches, law enforcement recovered: (a) hand-written notes containing contact emails, addresses, phone numbers, and other contact information for defendants He, Ji, Li, and Lu, as well as contact information for other PRC officials, including some assigned to the PRC Consulate in New York City; (b) email addresses and passwords for email accounts Wang shared with Ji and Li for the purpose of sharing Wang's "diaries"; (c) contact information for a variety of well-known Chinese dissidents, human rights leaders, and pro-democracy activists, including Ho; (d) electronic messages between Wang, Ji, and Li from in or around 2021; and (e) approximately 163 "diary" entries. (*Id.*).

I.  Wang's Convictions

Following a six-day jury trial, a federal jury convicted the defendant of all counts of the indictment: conspiring to act as an illegal agent of a foreign government without prior notification to the Attorney General, in violation of Title 18, United States Code, Section 371 (Count One); acting as an agent of a foreign government without prior notification to the Attorney General, in violation of Title 18, United States Code, Section 951 (Count Two); criminal misuse of identification, in violation of Title 18, United States Code, Section 1028(a)(7) (Count Three); and making false statements in connection with his interview with law enforcement on or about April 12, 2019, in violation of Title 18, United States Code, Section 1001 (Count Four). (PSR ¶ 37).

II.  Applicable Law

The Supreme Court has explained that the sentencing court "should begin all sentencing proceedings by correctly calculating the applicable [Guidelines] range. *Gall v. United States*, 552 U.S. 38, 49 (2007). The Supreme Court further has explained that "[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Id.* The sentencing court "should then consider all of the [18 U.S.C.] § 3553(a) factors to determine whether they support the sentence requested by a party." *Id.* at 49-50. In doing so, the court "may not presume that the Guidelines range is reasonable," but "must make an individualized assessment based on the facts presented." *Id.* at 50 (internal citation omitted).

Title 18, United States Code, Section 3553(a) provides, in part, that in imposing a sentence, the court shall consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant; [and]
>
> (2) the need for the sentence imposed--

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; [and]
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a). "[I]n determining whether to impose a term of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, [the court] shall consider the factors set forth in section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a).

At sentencing, "the court is virtually unfettered with respect to the information it may consider." *United States v. Alexander*, 860 F.2d 508, 512-13 (2d Cir. 1988). Indeed, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661.

III. <u>Guidelines Calculation</u>

With respect to Counts One and Two, Probation observed in the PSR that, under the U.S. Sentencing Guidelines ("Guidelines" or "U.S.S.G."), no Guideline expressly has been promulgated for Counts One and Two and there is no sufficiently analogous offense Guideline, such that the provisions of 18 U.S.C. § 3553 should control. With respect to Counts Three and Four, Probation found the combined adjusted offense level to be 4, and, given the defendant's lack of criminal history, found that the applicable Guidelines range is 0-6 months' imprisonment. (PSR ¶ 102, PSR Addendum at 2). For Counts Three and Four, the government calculates the defendant's offense level to be 6, because of the application of the obstruction enhancement, as outlined further below. A base level offense of 6 also results in a Guidelines range of 0-6 months' imprisonment.

With respect to Counts One and Two, as the PSR notes, no Guideline has been promulgated for 18 U.S.C. § 951 (or conspiring to violate § 951), which carries a statutory maximum term of imprisonment of 10 years, and 5 years for conspiring to do the same in violation of 18 U.S.C. § 371. (PSR ¶ 38). The government agrees with Probation that there is no sufficiently analogous Guideline, and further agrees that the provisions of 18 U.S.C. § 3553 control the imposition of an appropriate sentence, pursuant to U.S.S.G. §§ 2X1.1 and 2X5.1. (*Id.*). The government respectfully requests that the Court impose a significant, deterrent sentence for the defendant's Section 951 and conspiracy convictions. The government provides, in Part IV.B.iv below, information regarding sentences for other defendants convicted of Section 951 offenses.

With respect to Counts Three and Four, which are grouped pursuant to U.S.S.G. § 3D1.2(b), the government calculates the defendant's Guidelines as follows:

9

Counts Three and Four – Criminal Use of Identification and False Statements

    Base Offense Level (§ 2B1.1(a)(2))    **6**

    Plus: Obstructing or Impeding the Administration of Justice (§ 3C1.1)    **+2**

    Less 0 Criminal History Points (§ 4C1.1))    **-2**

    Total:    **6**

Multiple Count Analysis

    Highest Adjusted Offense Level    **6**

| Group/Count | Level | Units |
|---|---|---|
| Counts 3 & 4 | 6 | 1 |

    Total Units:    **1**

    Total:    **6**

The government's calculation is different from Probation's because it includes an obstruction enhancement for the defendant making materially false statements to law enforcement that significantly obstructed or impeded the investigation and prosecution in the instant matter during his 2019 interview at JRK Airport. (*See* PSR ¶¶ 45-59). During the interview, the defendant falsely denied that he had any contact with PRC government officials or the MSS. (Trial Tr. 328, 555). In fact, Wang had repeated contact with MSS and PRC officials and was in possession of MSS and PRC contacts in his address book at the time of the interview. (GX 100, 105, 105AT, 107, 107AT). The defendant's materially false statements significantly obstructed the investigation. Had the defendant not lied about his contact with PRC government officials, it would not have taken law enforcement nearly three years to bring criminal charges. Assuming a Criminal History Category of I, a total adjusted offense level of 6 yields a Guidelines range of 0-6 months' imprisonment. (PSR ¶ 102).

IV.    Argument

    For the reasons below, the government respectfully submits that a sentence of 48 months' imprisonment would be sufficient, but not greater than necessary, to achieve the goals of sentencing in this case. Such a sentence would constitute just punishment, reflect the severity of the defendant's offense, promote respect for the law, and provide the specific and general deterrence called for by the defendant's offenses.

    A.    With Respect to Counts One and Two, There Is No Analogous Guideline and Accordingly the Provisions of Section 3553 Control

    The appropriate offense level under the Guidelines is typically determined by reference to the statutory index contained in Appendix A to the Guidelines. *See* U.S.S.G. § 1B1.2(a). For statutory violations that are not listed in the appendix, the Guidelines

instruct that the "most analogous offense guideline" is to be used. U.S.S.G. § 2X5.1. Where, however, there is no sufficiently analogous Guideline provision, the Court is to sentence the defendant anywhere within the statutory sentencing range based on application of the Section 3553(a) factors. *See* U.S.S.G. § 2X5.1 ("If there is not a sufficiently analogous guideline, the provisions of 18 U.S.C. § 3553 shall control."). As relevant here, courts routinely have held that no sufficiently analogous Guideline provision applies to convictions for violating or conspiring to violate 18 U.S.C. § 951. *See, e.g.*, *United States v. Buryakov*, No. 15-CR-73 (RMB), ECF No. 158 at 6-7, 17 (S.D.N.Y.) (finding no sufficiently analogous Guideline provision where defendant was convicted of violating § 951 for agreeing to provide information to Russian official); *United States v. Chun*, No. 16-CR-618 (PGG), ECF No. 17 at 10 (S.D.N.Y.) (parties jointly submitted there was no analogous Guideline and court agreed where defendant was convicted of violating § 951 for providing sensitive information to Chinese officials); *United States v. Butina*, No. 18-CR-218, ECF No. 120 at 11-12 (D.D.C.) (observing "[t]he majority of the courts that have dealt with this issue have determined that § 951 does not have a sufficiently analogous guideline" and similarly finding no sufficiently analogous Guideline provision for conspiracy to violate § 951).

Here, too, no sufficiently analogous Guideline applies to the defendant's convictions for conspiring to act as an illegal agent of a foreign government, in violation of 18 U.S.C. § 371 (Count One), and acting as an illegal agent of a foreign government, in violation of 18 U.S.C. § 951 (Count Two).[2] Accordingly, the provisions of 18 U.S.C. § 3553(a) control, *see* U.S.S.G. § 2X5.1, and both Counts are appropriately excluded from the offense level computation, as explained in the PSR. The defendant argues that "for [his] crimes he faces a total offense level under the U.S. Sentencing Guidelines of four" (Def. Mem. at 1), but this calculation is only with respect to Counts Three and Four and fails to account for the most serious aspect of the defendant's criminal conduct—acting at the direction of the Chinese government on U.S. soil.

In sum, because there is no analogous Guidelines provision for the defendant's convictions on Counts One and Two, the government respectfully submits that the Court may sentence the defendant up to the statutory maximum of 60 months' imprisonment for Count One and 120 months' imprisonment for Count 2, based on application of the Section 3553(a) factors. Those factors are addressed below.

B.  Analysis of Sentencing Factors Under 18 U.S.C. § 3553(a)

Title 18, United States Code, Section 3553(a) requires courts to consider a number of factors in imposing a sentence, including the nature and circumstances of the offense, the history and characteristics of the defendant, the need for the sentence to serve as a deterrent, and the need to avoid unwarranted sentencing disparities. For the reasons below, analysis of these factors supports imposing a sentence of 48 months' imprisonment.

---

[2]  The offense level applied for a conspiracy offense is the offense level from the Guideline for the substantive offense. *See* U.S.S.G. § 2X1.1. Because 18 U.S.C. § 951 has no applicable or analogous Guideline, conspiracy to violate 18 U.S.C. § 951 similarly has no applicable or analogous Guideline.

11

Such a sentence is appropriate. The defendant's conduct—spying on Chinese dissidents in the United States on behalf of a foreign adversary—warrants a significant sentence.

i. The Nature and Circumstances of the Offenses

The nature and circumstances of the defendant's offenses are extraordinarily serious. The purpose of Section 951 is to protect the United States against subversive foreign influence within its borders. As detailed above, the defendant's actions furthered the PRC government's illegal intelligence collection in the United States. The defendant's conduct poses a serious threat to U.S. national security, sovereignty, and free speech.

The defendant's arguments that his conduct caused no actual harm to the United States or any person and did not "lead to any real world consequence," (Def. Mem. at 3, 14), are directly contradicted by the evidence presented at trial. As noted above, the defendant's actions—reporting on activists in the United States and Hong Kong to the MSS and taking a list of names and telephone numbers of prominent dissidents to China—provided valuable intelligence to MSS officers. As the government's expert witness testified at trial, the Chinese government has sought to repress and control the activities of pro-democracy movements in the United States and Hong Kong, as evidenced by the arrest of Ho. (Trial Tr. 255-56). And the MSS is specifically interested in "people's analysis, their insights, into what's happening" including "open source intelligence that helps steer [the MSS's] efforts, helps to gather information so they can prioritize . . . [the MSS's] covert activities." (Trial Tr. 306). This is precisely the type of information the defendant provided to the MSS to use against the U.S. government and individuals in the U.S. and Hong Kong. Such information can and does lead the PRC to harm the U.S. and individuals it views as adverse to the CCP.

The testimony of Dr. Anna Yeung-Chung demonstrates that she believes that the defendant's actions posed a danger: "This seems a list piled up with a lot of -- a lot of Chinese dissidents and activists from Hong Kong and I believe my personal information is in there and that it may pose a risk to my personal safety." (Trial Tr. 675). In connection with the defendant's sentencing, Dr. Yeung-Chung writes, "Mr. Wang endangered friends and colleagues alike, exemplifying the People's Republic of China's long-arm tactics of infiltration and repression— even on American soil—and further fueling distrust toward the Asian American community." (Ex. A at 2). The defendant's actions caused Dr. Yeung-Chung "distress, psychological heartbreak, and social damage" which "cannot be overstated." (*Id.*).

The defendant himself acknowledged that it was not safe to bring a list of personally identifying information of famous anti-CCP dissidents to China:

| SPECIAL AGENT IGO: | I mean, I don't know, I mean, it makes no sense to be calling from China, dissidents to tell them about an upcoming June 4th massacre event. I mean, it makes absolutely zero sense. |
|---|---|

12

| WANG: | I didn't think clearly, I was, it goes through my mind one moment that it, it might not be safe. |

(GX 805.9; Trial Tr. 791). Even those writing on his behalf acknowledge the safety risk posed by the defendant: "[the defendant's] actions . . . are unacceptable under U.S. law. The U.S. government protects our safety, and we cannot interfere with their efforts. . . . [T]he US government is fighting the Chinse Communist Party to protect our security, and I should thank them." (Def. Mem. Ex. C-2 at 2-3 (acknowledging the defendant's behavior "cross[ed] the legal red line.")). This harm is not merely speculative. One of the people who the defendant reported on, Dr. Ming Xia, writes that the defendant "caused psychological, reputational, and physical threat/damage to me. . . I have taken extra precautions and adjusted my lifestyle and daily routine to protect myself." (Ex. B. at 1). The threat to Chinese dissidents extends beyond those in the United States to family members still in China: "The Chinese government uses any concrete details of our personal information to smear, threaten our reputation, and threaten our family members and relatives back in China." (*Id.* at 2). Dr. Xia's letter accurately captures the defendant's conduct: "the fast remittance of our activities to Beijing sends chills to the spines of all critics of the totalitarian regime." (*Id.*). And yet another victim, who asked that he or she not be named, wrote:

> The harm he caused by providing the Chinese Ministry of State Security with the phone numbers and email addresses of more than 60 dissidents outside of China is potentially enormous. With this information, Chinese authorities could track dissidents and their associates and exert pressure on them and their families through harassment, intimidation, and punitive actions.

(Ex. C).

The reality is that we may never know the full extent of the harm posed by the defendant's actions. He operated covertly in the United States at the direction of a foreign intelligence agency, and the fallout of his conduct may never be fully uncovered. That he operated as an asset of a foreign government and used operational security to avoid detection and hide evidence does not weigh in favor of leniency. Just the opposite—the defendant should face a serious consequence for his actions.

    ii. <u>The History and Characteristics of the Defendant</u>

The defendant does not have any criminal convictions, but that is not the same as having no criminal history. Indeed, the evidence in the case established that despite this lack of criminal record, the defendant's life in the United States has been replete with fraud. In addition, the government respectfully submits that the defendant's arguments with respect to his age and his medical conditions do not warrant leniency in his sentence, especially when weighed against the other Section 3553(a) factors. Finally, the defendant's complete lack of remorse for his serious conduct also weighs in favor of a significant sentence.

While the defendant may not have a criminal record, it is clear that he has lived his life as a fraud. He holds himself out as a professor, but he has not been a professor in over three decades, never in the United States. (Def. Mem. at 7 (noting the defendant became a professor in 1992 and traveled to Columbia to be a visiting scholar in 1994)). He claims to have written several books, but he was found to have plagiarized by a Chinese court. Law enforcement subsequently asked the defendant about the lawsuit, and he admitted he was sued for plagiarism in China, although he denied losing the lawsuit. Even the defendant's mental health medical diagnosis appears to be based on inaccurate self-reporting of his supposed scholarship and authorship. (*See* Def. Mem. Ex. A-1). Finally, when law enforcement executed a search warrant at the defendant's residence in Norwich, Connecticut, they found fraudulent identification documents of other individuals, including passports, bank statements, and employment verification documents. Several passports appeared to be altered with different names. Additionally, at least one document from HSBC Bank had another individual's name and address glued on a piece of paper over the defendant's name and address. Law enforcement also uncovered photocopies of the same individual's passport. Law enforcement subsequently interviewed the individuals whose documents were found, all of whom denied providing the documents to Wang, which the exception of one individual who acknowledged providing an unmanipulated bank letter to the defendant.

And the defendant's crimes of conviction span decades. He pretended, day after day for years, to be an advocate for change and transparency, while simultaneously reporting his allies to their adversaries, known for brutal and oppressive tactics in pursuit of silencing dissent. This was not a one-time crime, committed on a date certain; the defendant's was an entire, well-rounded criminal life. Despite the lack of criminal convictions for his years of criminal conduct, in fashioning a just sentence the Court should consider the defendant's pervasive lies.

The defendant's age is a mitigating factor that the government considered in forming its recommendation. But the defendant's age does not merit a non-incarceratory sentence for three reasons. *First*, the defendant's age did not stop the defendant from committing crimes. The defendant committed the instant crimes into his seventies. *Second*, because many of the Memorial Foundation members—which honors the 1989 Tiananmen Square protests and massacres—are older, the defendant's age is an asset in committing this crime and furthering the goal of the PRC. *Third*, the defendant's crimes do not require youth. The crimes, which involved taking directions from MSS officers and reporting back on the activities of pro-democracy activists, and other groups the PRC views as a threat, can be committed at any age. The only things the defendant required to commit his crimes were a WeChat application and access to Chinese dissidents. Thus, if the defendant is not incarcerated, he is likely to continue his criminal conduct, regardless of his age, particularly in light of his failure to take responsibility for his crimes. And *finally*, the defendant reached his advanced age by committing his crimes undetected for decades—hardly a reason that he should be punished *less* than if he had been caught earlier.

With respect to the defendant's reported health issues, those issues similarly do not warrant leniency when weighed against the other Section 3553(a) factors. The government sympathizes with the defendant's medical ailments, but they are not so extraordinary or otherwise of such an unusual nature that the Bureau of Prisons would have difficulty accommodating them. *Cf. United States v. Crone*, 343 F. App'x 588, at *2 (2d Cir. 2009) (affirming substantive reasonableness of sentence imposed by district court despite defendant's serious cardiac condition because record supported that condition could be treated "as effectively in prison as out of prison");

14

*United States v. Kurland*, 718 F. Supp. 2d 316, 319 (S.D.N.Y. 2010) (declining to apply downward departure for defendant's health issues, which included hyperlipidemia, diabetes mellitus, and prostate cancer, noting that defendant was "not afflicted with an extraordinary physical impairment that the Bureau of Prisons would have difficulty accommodating").

Moreover, in considering the defendant's characteristics, the Court should consider the defendant's utter lack of remorse for his criminal conduct which jeopardized the sovereignty and national security of the United States. Sitting for an interview with the NEW YORK TIMES MAGAZINE, one month after his trial conviction, the defendant continued to claim his innocence and falsely claimed that He and Ji did not work for the MSS, and that he had not written intelligence reports for the MSS:

> At first, he told me he didn't know that He Feng and Ji Jie worked for the M.S.S. He also said he had written for himself the diaries that were presented at trial. "It was a hobby," he said.

Yudhijit Bhattacharjee *New York's Chinese Dissidents Thought He was an Ally. He was a Spy.*, NY TIMES MAGAZINE, (Jan. 10, 2025) available at https://www.nytimes.com/2025/01/10/magazine/china-spy-dissidents-new-york.html (last visited Mar. 31, 2025).

Even in one sitting with the reporter, the defendant could not maintain this obvious lie, and changed his story to yet another lie—that he was in contact with the MSS but only to bring democracy to the Chinese government:

> Later in the conversation, he admitted he had shared information about the foundation's activities with the officials because his objective — in line with the foundation's goals — was to influence the Chinese government into evolving democratically. The explanation seemed so far-fetched that even [trial witness Jianzhong] Gu, who had been translating with a straight face, broke into a laugh. Wang laughed, too, seeming to acknowledge how unconvincing his explanation sounded. Nonetheless, he persevered in his defense to me, which had now gone from denying contact with the M.S.S. to rationalizing contact with the M.S.S. to keep it in the loop. As secretary of the foundation, he said, "it was my job to give them information."

(*Id.*).

Notably, Gu testified as a defense witness at trial and admitted on cross examination that he did not know that the defendant reported on Gu's pro-democracy activities to the MSS. (Trial Tr. 853). Both theories—that Wang was working to bring democracy to the MSS and that he was only reporting on public information—were soundly rejected by the jury. The defendant's post-conviction conduct makes clear that the defendant is not remorseful for his criminal conduct. The Court should consider the defendant's attitude and lack of contrition in fashioning a just sentence.

### iii. The Need for the Sentence to Serve as a Deterrent

The seriousness of the defendant's offenses warrants a term of imprisonment that would deter others from undermining national security interests by illegally acting on behalf of foreign governments on U.S. soil. Through its just punishment of the defendant in this case, the Court can send an appropriate message that such conduct is grave and those engaging in such activities will receive serious punishment.

The need for general deterrence is of paramount importance given the PRC government's well-established transnational repression activities in the United States. Indeed, in recent years, the PRC government repeatedly has engaged in activities meant to suppress the rights of residents in this District. *See, e.g.*, *United States v. An, et al.*, No. 22-CR-460 (E.D.N.Y.) (KAM) (six defendants charged—with one convicted and others at large—of conspiring to and/or acting as illegal agents of PRC government in connection with multi-year scheme in which a PRC national living in United States and various U.S.-based and PRC-based family members were threatened in order to coerce the national's repatriation); *United States v. Ying*, No. 22-MJ-1711 (S.D.N.Y.) (charging at-large PRC national with conspiring to and acting as illegal agent of PRC government in connection with multi-year scheme in which PRC nationals living in United States and various PRC-based family members were threatened in order to coerce the nationals' repatriation, including by detaining a pregnant PRC-based relative, and alleging various conduct undertaken in furtherance of the scheme in the Eastern District of New York). Notably, the U.S. Department of Homeland Security has warned that the PRC "likely will continue to pursue transnational repression activity" in the United States. *See* Office of Intelligence and Analysis, U.S. Dep't of Homeland Security, "Homeland Threat Assessment: 2024," available at https://www.dhs.gov/sites/default/files/2023-09/23_0913_ia_23-333-ia_u_homeland-threat-assessment-2024_508C_V6_13Sep23.pdf at 7 (last visited Jan. 7, 2025). The pervasiveness and seriousness of the PRC conduct in the United States, and here in the Eastern District, underscores the need for general deterrence.

Moreover, the difficulty in detecting intelligence assets like the defendant weighs in favor of more substantial punishments for those who are held to account for their crimes. "Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it." *United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994). Imposing a substantial sentence in this case is necessary to dissuade other potential agents from engaging in such activities in the United States and here in the Eastern District, and to send a clear message that those who act to further PRC objectives and participate in transnational repression activities on U.S. soil will face consequences.

### iv. The Need to Avoid Unwarranted Sentencing Disparities

A sentence of 48 months' imprisonment would not result in unwarranted sentencing disparities.

With respect to Counts One and Two, courts have imposed significant sentences for Section 951 convictions. The Court should avoid unwarranted sentencing disparities by

imposing 48 months' imprisonment. Such a sentence is commensurate with the following sentences imposed upon similarly situated defendants who were convicted of Section 951 charges:

- *United States v. Li*, No. 24-CR-334 (M.D. Fla.): Li worked at the direction of officers of the PRC Ministry of State Security over an approximately ten-year period to obtain information of interest to the PRC government, including information concerning dissidents and pro-democracy advocates and members of the Falun Gong religious movement; most of the information he provided was publicly available. Li pleaded guilty to conspiracy to act as an illegal agent of the PRC and was sentenced to 48 months' imprisonment. He also was fined $250,000. (ECF No. 39.)

- *United States v. Abouammo*, No. 19-CR-621 (N.D. Cal.): Abouammo was bribed by the Kingdom of Saudi Arabia and the Saudi Royal Family to access, monitor, and convey the confidential user information of anonymous Saudi dissidents that Twitter held. Such information could have been used by the Saudi government to identify and locate the Twitter users who published the critical posts. After conviction by trial of violating, *inter alia*, 18 U.S.C. § 951, the Court sentenced Abouammo to 42 months' imprisonment on his illegal foreign agent conviction.[3] (ECF No. 426.)

- *United States v. Cabrera Fuentes*, No. 20-CR-20129 (S.D. Fla.): Cabrera Fuentes acted under the direction and control of a Russian government official to engage in surveillance of a Russian defector. Following the Russian official's instructions, Cabrera Fuentes arranged for an intermediary to lease a unit to the defector in the Miami area; traveled to Miami to obtain the license plate number and parking location of the defector's car to provide to the Russian official on his next trip to Russia; and took a photo of that defector's car, which he sent to the official. Cabrera Fuentes pleaded guilty to violating 18 U.S.C. § 951 and was sentenced to 48 months' imprisonment. (ECF No. 58.)

- *United States v. Doostdar*, No. 18-CR-255 (D.D.C.): Doostdar was a dual U.S.-Iranian citizen who traveled to the United States on behalf of the Iranian government. He recruited a second individual to attend a rally in New York City protesting the Iranian regime. At the rally, the second individual photographed the protesters and provided those photos to Doostdar. Doostdar pleaded guilty to conspiracy to act as an illegal foreign agent and acting as an illegal foreign agent and was sentenced to 38 months' imprisonment. (ECF No. 121.)

---

[3] The Ninth Circuit subsequently vacated the sentence and remanded for resentencing based on an unrelated Guidelines calculation for Abouammo's other offenses of conviction. See *United States v. Abouammo*, No. 22-10348, 2024 WL 4972564 (9th Cir. Dec. 4, 2024).

- *United States v. Alvarez*, No. 05-CR-20943 (S.D. Fla.): Alvarez was an agent of Cuba's Directorate of Intelligence and its predecessor intelligence agencies. Between the late 1980s and 1990s, Alvarez gathered information within the United States on matters of interest to the Cuban government, including informing on anti-Castro individuals and groups and other elements of the Cuban exile community in South Florida. Alvarez pleaded guilty to conspiracy to act as an illegal foreign agent and was sentenced to 60 months' imprisonment. (ECF No. 236.)

- *United States v. Dumeisi*, No. 03-CR-664 (N.D. Ill.): Dumeisi, who published an Arabic language newspaper from the United States, was recruited by the Iraqi Intelligence Service to collect information regarding individuals and groups considered to be hostile to the Hussein regime. After conviction by trial of acting as an illegal foreign agent and conspiracy to act as an illegal foreign agent, Dumeisi was sentenced to 46 months' imprisonment. (ECF No. 138.)

These cases demonstrate that a sentence of 48 months' imprisonment would avoid unwarranted sentencing disparities with sentences imposed on similarly situated defendants.

V.   Conclusion

For the forgoing reasons, given the serious nature of the criminal conspiracy and the defendant's role in that conspiracy, and the threat to U.S. national security posed by the actions of the defendant and his co-conspirators, the government respectfully submits that a sentence of 48 months' imprisonment would be sufficient, but not greater than necessary, to achieve the goals of sentencing in this case.

JOHN J. DURHAM
United States Attorney
Eastern District of New York

By:   /s/
Ellen H. Sise
Nina C. Gupta
Assistant U.S. Attorneys
(718) 254-7000

Sue J. Bai
Supervisory Official
Department of Justice
National Security Division

By:   /s/
Garrett Coyle
Trial Attorney

Cc:   Clerk of the Court (by ECF and Email)
Counsel of Record (by ECF)