UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

- AGAINST -

SHUJUN WANG,

DEFENDANT.

22 Cr. 230 (DC)

**REPLY SENTENCING MEMORANDUM**

ZMO Law PLLC
353 Lexington Avenue, Suite 900
New York, NY 10016
(212) 685-0999
zach@zmolaw.com

*ATTORNEYS FOR DEFENDANT SHUJUN WANG*

# TABLE OF CONTENTS

ARGUMENT.................................................................................................2

I.   THE GOVERNMENT HAS FAILED TO SHOW ANY HARM RESULTING FROM PROF. WANG'S CRIMINAL CONDUCT. ............................................2

II.  THE GOVERNMENT'S CHARACTERIZATIONS OF PROF. WANG'S STATEMENTS ARE MISLEADING, ESPECIALLY IN LIGHT OF THE NEWLY AVAILABLE UNCHALLENGED EVIDENCE OF PROF. WANG'S DETERIORATING MENTAL HEALTH..........................................................5

III. A SENTENCE OF SUPERVISED RELEASE WITH COMMUNITY SERVICE IS SUFFICIENT BUT NOT GREATER THAN NECESSARY TO AVOID UNWARRANTED SENTENCING DISPARITIES WITH DEFENDANTS FOUND GUILTY OF SIMILAR CONDUCT..................................................7

IV. THE GOVERNMENT'S ARGUMENTS ABOUT PROF. WANG'S HISTORY AND CHARACTERISTICS DO NOT SUPPORT A SENTENCE OF INCARCERATION. .............................................................................8

V.  THE 2019 STATEMENT TO LAW ENFORCEMENT DID NOT "SIGNIFICANTLY OBSTRUCT OR IMPEDE" THE INVESTIGATION AND SO A GUIDELINES ENHANCEMENT IS NOT WARRANTED. ...........................10

CONCLUSION..........................................................................................11

This memorandum is submitted in reply to the government's letter-brief advocating for a 48-month sentence for Shujun Wang, a ███████ 76-year-old former professor who was found guilty after trial of providing information about to Chinese officials and lying about it to FBI agents. *See* ECF No. 129: Gov't Letter dated April 4, 2025 (hereinafter "Gov't Let."). Despite more than eight years of investigation, the government has proffered no evidence that Prof. Wang's conduct caused any identifiable harm other than traumatizing people approached by the government.

At the same time, the government's sentencing submission fails even to acknowledge:

- ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

- The opinions of two medical experts that it will be "extremely difficult" for the Bureau of Prisons to provide adequate medical care, Ex. A-1 at 11; Ex. A-2 at 2.

- Overwhelming evidence that Prof. Wang was not "masquerade[ing] as a pro-democracy activist," Gov't Let. at 1, *see also id.* at 14, but in fact "contributed significantly to the pro-democracy movement." Ex. C-2 at 1.

Finally, the government reveals no venality or criminality that should give rise to a lengthier sentence when it points to Prof. Wang's contradictory statements to an undercover agent, the FBI, and in a New York Times article during hours and hours of voluntary interviews. Gov't Let. at 6-8, 15. Rather, Prof. Wang's statements are a symptom of his ████████████████████████ and show how he has become increasingly confused and ██████ as the investigation unfolded.

---

[1] Unless otherwise stated, exhibits cited herein refer to the unredacted exhibits to the defendant's Sentencing Memorandum dated March 31, 2025.

The picture that is painted at the end of the day is not of a debonair fraudster who was a secret spy for the Chinese Communist Party, but rather of an aging democracy activist—lonesome and starved for attention, eager to please, and always delighted to engage—who occasionally provided mostly-useless information to the Chinese government and lied about it as he became older, more impaired, and more isolated. The government's unsupported attempts at character assassination are addressed below. While we cannot deny, based on the jury's verdict, that Prof. Wang's conduct merits punishment, he is being punished already as the full weight of the U.S. government is brought to bear to destroy his reputation and his family life. Additional imprisonment in a Bureau of Prisons facility—much less incarceration until he turns 80 years old—would be a sentence greater than necessary to achieve the objectives of sentencing in light of his failing health, ██████████, and accomplishments on behalf of the democracy movement that mitigate the limited harm caused by his contact with Communist officials.

## ARGUMENT

### I. The government has failed to show any harm resulting from Prof. Wang's criminal conduct.

The government asserts that Prof. Wang's conduct was "extraordinarily serious" but struggles to articulate any real harm that arose or could have arisen as a result of his provision of information to Chinese officials. Gov't Let. at 12-13. While claiming that the information contained "valuable intelligence to MSS officers," the government does not explain how the information was valuable, non-public or could have led to any harm. The fact that the government expert testified that the MSS was "interested" in such

information, including from open sources, does not mean that it is used or was used to harm anyone.

Anna Yeung-Cheung's letter, Exhibit A to the government's submission, does not move the needle much on this point because she merely asserts that she was endangered without ever explaining how. Clearly, she disagrees in principle with what Prof. Wang did, but she does not and cannot assert that it caused any actual consequences, when contrasted with Prof. Wang's strong support among other dissidents who don't agree with Dr. Yeung-Cheung's assessment of the impact of Prof. Wang's actions. *See* Exs. C-1, C-2, D-20, D-15. ███████████████████████████████ Dr. Yeung-Cheung reported that Albert Ho, the Hong Kong democracy activist, told her that he did not "discuss anything 'sensitive'" with Prof. Wang at a lunch that was nonetheless reported on (inaccurately) in the Epoch Times and discussed at trial.[2]

Similarly, Dr. Ming Xia's letter, attached as Exhibit B to the government's brief, uses hyperbole and describes general nefarious activities of the Chinese government, but does not describe any actual danger or harm that can be linked to Prof. Wang's disclosures to the MSS.

The same is true for the unnamed correspondent ████████████████████████ ████████, who speculates that Prof. Wang's providing names and phone numbers of dissidents could lead to their being pressured by the Chinese government. But neither the writer nor the government can point to anyone on the list who was affected in any way.

---

[2] ████████████████████████████████████████████████████
████████████████████████████

Moreover, the writer acknowledges that Prof. Wang "was already under suspicion" by colleagues in the democracy movement as early as 2008, corroborating Juntao Wang's account of being aware of Prof. Wang's contact with MSS. ███████ The writer herself was an early supporter of the work done by Prof. Wang, Juntao Wang, and the head of the Hu Zhao Foundation, attorney Jinjin "Jim" Li. The writer made contact with the family of Hu Yaobang in China in 2012 and wrote to Prof. Wang and the other Hu Zhao leaders that the famous liberal Communist's son had never heard of the foundation but was "very pleased" to hear about its establishment. ████████████ Email to Jinjin Li, Shujun Wang, and the Hu Zhao Foundation ████████████████████████ ██████. The response from the head of the foundation, Jinjin Li, who according to Juntao Wang was aware of Shujun Wang's contacts with the MSS, *see* Ex. C-2, was that the group's "communication work needs further improvement." *Id*.

Finally, the government's short quotation from Prof. Wang's 49-page post-arrest interview with FBI agents, Gov't Let. at 13, does not demonstrate that Prof. Wang's actions caused harm. ███████████████████



*Still from Government Exhibit 805.9, with was Prof. Wang's post-arrest interview with FBI Agents Garret Igo and Devin Perry and an interpreter.*

████████ ██████ ████ ████

 His "admission" was a response to FBI Special Agent Garrett Igo's aggressive, repetitive questioning. The interview took place in custody following a 6:00 a.m. arrest in a small windowless room

crowded with four large men. Reviewing the video, one can see that Prof. Wang is willing to say whatever Agent Igo wants. His eyes are closed when he is speaking and he appears distressed. ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████ Under these circumstances, it is no surprise that Prof. Wang was willing to endorse Agent Igo's characterizations of what he did. As with every other letter writer and witness, Prof. Wang did not make any link between any information he provided and any specific harm or action by the Chinese government.

II.     **The government's characterizations of Prof. Wang's statements are misleading, especially in light of the newly available unchallenged evidence of Prof. Wang's deteriorating mental health.**

The government accurately describes the voluminous paper record it developed in this investigation, Gov't Let. at 2-5, but its characterizations of the hours of statements given by Prof. Wang in 2021 are not accurate. That summer, an undercover agent approached Prof. Wang at his daughter's home in Connecticut and spent several hours with him. *See* Gov't Let. at 6-7. If the Court is inclined to accept the government's arguments based on this interview, we ask that in consider the entire video and 87-page transcript, GX 800-T, which reveals Prof. Wang did not really understand who the undercover was, why he was there or what they were talking about. The "counterespionage" techniques like deleting files are all proposed by the undercover and accepted, with varying levels of colorful enthusiasm, by Prof. Wang. Similarly, the

5

rambling six-and-a-half-hour interview by FBI agents a few days later mostly revealed Wang's disorientation ████████████████████████████. *See* Gov't Let. at 6-7.

These interactions are best understood in light of Dr. Drob's later Forensic Psychological Report on Prof. Wang, which explained his ██████████ and their impact on his functioning:



Ex. A at 11.

While we did not ask Dr. Drob to address the summer of 2021 statements specifically, his observations are applicable and readily apparent from the videos. Prof. Wang comes off not as a clever spy in these interactions, but as solicitous, naïvely seeking recognition and acceptance, first from the undercover, then from the FBI agents. He explains to the undercover that the information he provided to the MSS was already public not, as the government suggests, as a sophisticated ploy to protect himself from a future prosecution, but because he did not see his work for the MSS as significant or important. He talked and talked and talked in both encounters, just for the sake of talking.

**III.**   **A sentence of supervised release with community service is sufficient but not greater than necessary to avoid unwarranted sentencing disparities with defendants found guilty of similar conduct.**

The government points to six sentences for violations of 18 U.S.C. § 951 ranging from 38 to 60 months. Gov't Let. at 17-18.  But, we submit, none of these sentences provides a good analogue for what Shujun Wang did and none presented the kind of mitigation present here. In *Li*, for example, unlike here, the defendant provided technical cybersecurity information to the MSS with the potential to help into hack into U.S. wiretap systems. *See U.S. v. Li*, No. 24-CR-334 (M.D. Fla.), ECF No. 34: Gov't Sentencing Memorandum at 3 (Chinese government sought information to bypass U.S. cybersecurity defenses). Contrary to the government's characterization in seeking a long sentence for Prof. Wang, the information Li provided was *not* publicly available but came from the defendant's "employer, a major telecommunications provider, which he later admitted he knew he was not authorized to share." *Id.* Unlike Prof. Wang, there is no indication Li had any medical or mental health problems, see *U.S. v. Li*, No. 24-CR-334 (M.D. Fla.), ECF No. 37 (defendant's sentencing memo), and therefore it cannot be said that a lower sentence for Prof. Wang would create an unwarranted sentencing disparity.

The fact is, punishment in Foreign Agent Registration Act cases varies widely; no two cases are alike. Many defendants receive probation, supervised release, or brief prison terms even for far more harmful conduct than the information flow at issue here. Just last month, for example, a Queens businessman was sentenced to 20 months in prison and ordered to pay $5 million in forfeiture and restitution for participating as an agent of the Chinese government in a campaign of harassment. *See U.S. v. An*, 22 Cr. 460 (E.D.N.Y.),

ECF No. 256 (Judgment), 220 (Gov't Sentencing Memo). The government in that case

sought a sentence of 60 months based on "the defendant's central and critical role, over a

period of five years, in the campaign to coerce John Doe-1 to repatriate to the PRC." *See*

*also, e.g., U.S. v. Ying Lin,* 15 Cr. 601 (AMD), ECF Nos. 172 (Gov't Sentencing Memo), 174

(Judgment) (E.D.N.Y. Dec. 10, 2019) (airline employee sentenced to five years' probation

for smuggling for Chinese military officers; government sought 48 month sentence of

incarceration); *see also U.S. v. Chaudry,* 18-CR-226, Dkt. No. 14 (Plea Agreement) (D. Md.,

May 7, 2018) (prosecutors agreed as part of a plea deal to recommend five years' probation

where defendant engaged in political activities as an agent of the Pakistani government

for six years, including obtaining in-depth information about U.S. policies toward

Pakistan); *U.S. v. Chun*, 16-CR-518, Dkt. No. 17 (Sent. Tr.) at 13 (S.D.N.Y., Jan. 30, 2017)

(former FBI agent sentenced to 24 months' imprisonment for repeatedly providing a

Chinese official with FBI information); *U.S. v. Islamic American Relief Agency et al,* 07-CR-

87, ECF Nos. 645, 647 (Judgments) (W.D. Mo. Jan. 12, 2012) (former U.S. congressman

sentenced to one year imprisonment and fundraiser sentenced to two years' probation for

work with relief agency secretly funneling money to Iraq in violation of U.S. government

sanctions). Given Shujun Wang's advanced age and health problems and the limited harm

done by his actions, a sentence of probation would be well within the scope of these and

other comparable FARA cases.

IV.     **The government's arguments about Prof. Wang's history and characteristics
        do not support a sentence of incarceration.**

The government admits that Prof. Wang has no criminal history but argues, without

evidence, that he has "lived his life as a fraud." Gov't Let. at 13-14. One must look no

further than the dozens of letters submitted with our initial memorandum to understand this is not true—while his story is complicated there is overwhelming evidence his work *against* China's Communist government was both sincere and effective. The choice to refer to him repeatedly as "Professor" at trial was made by counsel; he does not "hold himself out" as anything but a humble writer with an abiding interest in the intersection of American and Chinese history in the mid-20th Century. There is no evidence in this record that he ever committed plagiarism.

The government next argues that Prof. Wang's medical issues can be managed by the Bureau of Prisons, despite the fact that he is 76 years old and his health is rapidly deteriorating. Gov't Let. at 14. It points to 2009 and 2010 cases to support its contention, ignoring the current crisis within Bureau of Prison and the two letters by experience professionals who have examined Prof. Wang and opined that his medical and psychological issues cannot be managed in prison. *See* Ex. A-1 at 11 ███████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████

Finally, the government faults Prof. Wang for an "utter lack of remorse" based on an internally contradictory interview he sat for with the New York Times Magazine. Gov't

Let. at 15. But the interview is just another example of Prof. Wang's ████ —he contradicted himself in ways that made him laugh along with his friend and trial witness Jianzhong Gu, who was serving as a translator. *Id*. This unhinged behavior, which he knew could not possibly help him at sentencing or in any other way, is evidence of confusion and ████ not lack of remorse. Moreover, Mr. Gu has stuck with Prof. Wang, even after learning in detail about his contacts with the MSS. *See* Ex. D-20. Shujun "loves China, but he loves the United States more," writes Mr. Gu. "He enjoys his life in the United States and should never have any subjective reason or intention to harm the United States. My relatives and friends all feel deeply sorry for him[.]" *Id.*

V.      **The 2019 statement to law enforcement did not "significantly obstruct or impede" the investigation and so a Guidelines enhancement is not warranted.**

Finally, in its sentencing letter, the government for the first time accuses Prof. Wang of obstruction under U.S.S.G. § 3C1.1 "for the defendant making materially false statements to law enforcement" in his interview at JFK Airport in 2019. However, this provision requires not just materially false statements, but a showing that the statements "significantly obstructed or impeded" the investigation. *See U.S. v. Williams*, 79 F. 3d 334 (2d Cir. 1996). The government has not made such a showing—the finding that Prof. Wang denied his contacts with Chinese officials when he landed in 2019 was akin to a false denial at arrest, and did not have a real effect on the course of the investigation. *See id.* ("The district court did not find, nor could it have found on this record, that Facey's denials to the officer 'significantly obstructed or impeded' the investigation into Facey's crime. ... Facey's false custodial statements alone were insufficient to support the

obstruction of justice enhancement."). Therefore, the enhancement is not warranted and the applicable Guidelines total offense level is four, with an advisory Guidelines Sentence of zero to six months incarceration or a term of probation.

**CONCLUSION**

A sentence of probation or time-served with post-release supervision is adequate to achieve the objectives of the Sentencing Reform Act, 18 U.S.C. § 3553(a), in this case because Prof. Shujun Wang's conduct did not cause harm and the prosecution has adequately punished him given his advanced age, and rapidly deteriorating physical health and intellectual functioning.

Dated:        April 7, 2025
              New York, New York


Respectfully submitted,
ZMO Law PLLC

From: _____/s/_____
      Zachary Margulis-Ohnuma
      353 Lexington Avenue, Suite 900
      New York, NY 10016
      (212) 685-0999